IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

CHARLES DENT, # N-42308,

        Plaintiff,

vs.                                                  Case No. 18-cv-1156-DRH

JEFFERY M. DENNISON,
L. WALKER,
LT. PICKFORD,
SAMUEL STERRETT,
and LANCE MAHAN,

        Defendants.

## MEMORANDUM AND ORDER

**HERNDON, District Judge:**

Plaintiff is a long-term prisoner, currently incarcerated at Shawnee Correctional Center ("Shawnee"), and has brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff claims that Defendants conspired to retaliate against him for filing complaints against Mahan, by excluding him from religious services, in violation of the Constitution and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). In addition to the Complaint, Plaintiff has filed a motion for a Temporary Restraining Order and Preliminary Injunction. (Doc. 3). This case is now before the Court for a preliminary review of the Complaint pursuant to 28 U.S.C. § 1915A.

Under § 1915A, the Court is required to screen prisoner complaints to filter out non-meritorious claims. *See* 28 U.S.C. § 1915A(a). The Court must dismiss

1

any portion of the Complaint that is legally frivolous, malicious, fails to state a claim upon which relief may be granted, or asks for money damages from a defendant who by law is immune from such relief. 28 U.S.C. § 1915A(b).

An action or claim is frivolous if "it lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Frivolousness is an objective standard that refers to a claim that "no reasonable person could suppose to have any merit." *Lee v. Clinton*, 209 F.3d 1025, 1026-27 (7th Cir. 2000). An action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The claim of entitlement to relief must cross "the line between possibility and plausibility." *Id*. at 557. Conversely, a complaint is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the Court is obligated to accept factual allegations as true, see *Smith v. Peters*, 631 F.3d 418, 419 (7th Cir. 2011), some factual allegations may be so sketchy or implausible that they fail to provide sufficient notice of a plaintiff's claim. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). Additionally, Courts "should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements." *Id*. At the same time, however, the factual allegations of a *pro se* complaint are to be liberally construed. *See Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011); *Rodriguez v. Plymouth Ambulance*

*Serv.*, 577 F.3d 816, 821 (7th Cir. 2009).

Applying these standards, the Court finds that Plaintiff's claims survive threshold review under § 1915A.

## The Complaint

The Defendants in this action are Shawnee Warden Dennison, Assistant Warden Walker, Lt. Pickford, Shawnee Chaplain Sterrett, and Mahan, who is a volunteer pastor at Shawnee. On April 10, 2018, after Plaintiff filed a sexual harassment complaint against Mahan under the Prison Rape Elimination Act ("PREA"), Defendants retaliated by removing Plaintiff from 3 Protestant religious services which he had been attending for over 35 years in prison. As a result, Plaintiff was only permitted to attend Catholic mass once per week. (Doc. 1, p. 11).

Plaintiff includes much background information regarding his religious affiliations and activities during his years of incarceration. (Doc. 1, pp. 6-11). His original designated religion was Baptist, however, he has routinely attended religious services of other faiths as well, including Catholic services. (Doc. 1, p. 6). In 2009, Plaintiff changed his religious affiliation from Baptist to Catholic. In 2012, after a prison transfer, the chaplain approved Plaintiff's attendance at Baptist and other Protestant services, even though he remained designated as a Catholic and continued to attend Catholic mass. He continued attending Baptist, Protestant, and Catholic services from 2012-2016. (Doc. 1, p. 7).

On May 10, 2016, Plaintiff was transferred to Shawnee. The chaplain at

3

that time approved him to attend Catholic mass, Baptist, and Protestant services. Plaintiff asserts that the policy, custom, and practice at all prisons has been to allow an inmate to attend any requested chapel services, up to a total of 4 services, regardless of the prisoner's designated religious affiliation. (Doc. 1, p. 8).

In November or December 2017, Sterrett became the Shawnee Chaplain. Plaintiff had several conversations with Sterrett to obtain his approval to attend Sunday Protestant chapel services consistent with the scheduled times for the housing wing where Plaintiff was assigned. (Doc. 1, p. 8). One such encounter occurred on January 15, 2018, after Plaintiff was moved to a different housing area. (Doc. 1, pp. 9-10). Sterrett always approved Plaintiff's requests. At no time did Sterrett ever inform Plaintiff that he could not attend Protestant services due to his Catholic designation, of which Sterrett was aware. In March 2018, Plaintiff approached Sterrett during Tuesday morning Catholic mass, and asked permission to attend Friday night Protestant services; Sterrett approved. (Doc. 1, p. 10). After this, Plaintiff regularly attended 4 chapel services: Sunday morning Protestant chapel, Tuesday morning Catholic mass, Tuesday night Protestant services, and Friday night Protestant services. (Doc. 1, p. 19; Doc. 1-1, p. 6).

Since January 2017, Plaintiff had routinely attended the Sunday Protestant chapel services at Shawnee, which were conducted by volunteer pastor Mahan. (Doc. 1, pp. 11-12). Plaintiff is gay, and during these services, he sat together with other gay, bisexual, and transgender inmates so they could support each

other. During Sunday services, Mahan regularly verbalized his homophobic views, and "preach[ed] hate against the gay, bisexual, and transgender prisoners" at Shawnee. (Doc. 1, p. 12). Mahan's statements were "degrading, humiliating, and offensive" to Plaintiff and his fellow gay, bisexual, and transgender ("LGBT") inmates, but they continued to attend chapel.

On or around March 2018, Mahan's began to "sexually harass" Plaintiff and his fellow LGBT prisoners, for example, by sitting directly behind Plaintiff's group and making offensive and derogatory comments, while shaking his head. *Id.* Mahan escalated his harassment as he preached, including comments and questions such as, "how could a man masturbate another man," and "do you fantasize about another man." (Doc. 1, p. 13). Plaintiff feared that these derogatory remarks, made by a "person of authority," could worsen the threats LGBT inmates already faced to their safety and security at Shawnee. *Id.*

On approximately March 8, 2018, a transgender inmate (Spoden) who regularly attended Mahan's services and sang in the choir lodged a verbal complaint with Sterrett about Mahan's conduct. Sterrett told Spoden that he would direct Mahan to cease his homophobic speeches and advocacy of violence against LGBT prisoners. (Doc. 1, pp. 13-14). However, Mahan did not stop his comments, but instead intensified his targeting of LGBT inmates. Mahan told another inmate that he (Mahan) would not be disciplined because Sterrett and Assistant Warden Walker were "rocking with him." (Doc. 1, p. 14).

After Spoden's complaint, Mahan announced during chapel that another

5

inmate (Madison) had a "testimony," after which Madison took the podium. Madison proceeded to spout hateful and derogatory language against the LGBT prisoners in attendance. Madison called out those prisoners' names and advocated violence against them. (Doc. 1, p. 14). These comments drew cheers from the approximately 50 non-LGBT inmates attending the chapel service. Mahan allowed Madison to continue with this rant for about 10 minutes. While Madison spoke, inmate Spoden approached Mahan to express her frustration with Madison's preaching of hate and violence, but Mahan responded by saying, "he is only preaching God's word." (Doc. 1, p. 15; Doc. 1-1, pp. 8-11).

On April 8, 2018, Plaintiff was sitting with his LGBT group as the chapel service started. He and most of the inmates in attendance were standing, singing along with the choir, and clapping. (Doc. 1, p. 15). Mahan suddenly pointed at Plaintiff and ordered him to leave the chapel. When Plaintiff asked why, Mahan responded that it was because Plaintiff was talking. Plaintiff denies this, stating that he was singing with the congregation and choir, and notes that because of the singing and general noise level, it would have been impossible for Mahan to hear any person talking. Plaintiff asserts that the only reason he was removed was because of Mahan's homophobic views, and because he is a "senior member" and leader within the LGBT community. (Doc. 1, p. 16).

After Mahan kicked Plaintiff out of the chapel service, Plaintiff wrote a PREA complaint (directed to Walker, who is the PREA compliance officer) against Mahan for sexual harassment, based on the many inappropriate sexual comments

6

Mahan had made over the past year. Plaintiff also filed an emergency grievance against Mahan, seeking to have Mahan barred from entering Shawnee because he had advocated violence against LGBT inmates attending Sunday services. (Doc. 1-1, pp. 1-2). Dennison denied the emergency grievance, and Plaintiff filed a regular grievance against Mahan for allowing inmate Madison to advocate violence against LGBT inmates. (Doc. 1, p. 16; Doc. 1-1, pp. 3-4). That grievance was sent to Sterrett for review. (Doc. 1, p. 17; Doc. 1-1, p. 5). Immediately after Sterrett issued his response (which referred the PREA matter to Internal Affairs), Sterrett retaliated against Plaintiff by removing him from the list to attend the Tuesday night and Friday night Protestant services, which Sterrett had previously approved. (Doc. 1, p. 17; Doc. 1-1, p. 7).

On April 10, 2018, Lt. Pickford interviewed Plaintiff regarding the PREA complaint against Mahan. *Id.* Plaintiff described Mahan's conduct in detail, and provided Pickford with names of other LGBT inmates who had been affected. (Doc. 1, p. 18). Pickford "leaked" this information to Walker, Mahan, and Sterrett. After this, inmate Spoden was also removed from all her religious services for cooperating with the investigation. (Doc. 1, pp. 18, 22; Doc. 1-1, pp. 8-11).

Plaintiff filed a grievance against Sterrett over the termination of his attendance at the 2 services, and wrote to Walker and Pickford. (Doc. 1, p. 20; Doc. 1-1, pp. 12-13). Walker and Pickford did not respond. Sterrett responded to this grievance by stating that Plaintiff was removed from the Protestant

7

religious services because he is identified as Catholic and may only attend Catholic services. (Doc. 1, pp. 22-23, Doc. 1-1, p. 12). Plaintiff concludes that Sterrett's statement was an attempt to "shield his retaliation," by citing an Administrative Code section which contradicts the stated reason for his action. (Doc. 1, p. 23). Plaintiff asserts that from his personal knowledge, over half of the 40 inmates who regularly attend Catholic mass also attend non-Catholic religious services, even though they are identified within the prison as Catholic. (Doc. 1, pp. 24-26; Doc. 1-1, pp. 15-24).

Plaintiff also filed a formal PREA complaint after Sterrett terminated him from the first 2 religious services. (Doc. 1, p. 20). The PREA directs that monitoring should be conducted to ensure a complaining inmate does not experience retaliation. Walker and Pickford, however, did nothing to protect Plaintiff from retaliation, and instead "conspired" with Sterrett and Mahan to retaliate against him. (Doc. 1, p. 21).

The next week, Plaintiff was also removed from the Sunday morning Protestant service (run by Mahan). (Doc. 1, p. 24; Doc. 1-1, p. 14).

Plaintiff asserts claims of conspiracy to retaliate against him for exercising his First Amendment rights, violation of his rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") and the First Amendment, and violation of his Fourteenth Amendment right to equal protection. (Doc. 1, pp. 27-31). He seeks declaratory and injunctive relief, as well as damages. (Doc. 1, p. 32).

## Merits Review Pursuant to 28 U.S.C. § 1915A

Based on the allegations of the Complaint, the Court finds it convenient to divide the *pro se* action into the following counts. The parties and the Court will use these designations in all future pleadings and orders, unless otherwise directed by a judicial officer of this Court. The designation of these counts does not constitute an opinion as to their merit. Any other claim that is mentioned in the Complaint but not addressed in this Order should be considered dismissed without prejudice.

> **Count 1:** Sterrett retaliated against Plaintiff in violation of the First Amendment, by revoking Plaintiff's permission to attend 3 Protestant religious services at Shawnee, in which Plaintiff had been participating for years at Shawnee and at other prisons, after Plaintiff filed a PREA complaint and grievances against Mahan and Sterrett;
>
> **Count 2:** Defendants conspired to retaliate against Plaintiff by excluding him from religious services after Plaintiff filed a PREA complaint and grievances against Mahan for exhorting other inmates to inflict violence on Plaintiff and other LGBT inmates, and filed complaints against Sterrett;
>
> **Count 3:** Defendants violated Plaintiff's rights under the First Amendment and the RLUIPA to freely exercise his religious beliefs, by excluding him from religious services in which he had regularly participated for years;
>
> **Count 4:** Sterrett violated Plaintiff's Fourteenth Amendment right to equal protection by terminating him from participation in non-Catholic religious services, while other Catholic inmates were allowed to participate in non-Catholic services.

Each of these claims shall receive further consideration.

## Count 1 – Retaliation

Prison officials may not retaliate against inmates for filing grievances,

lawsuits, or otherwise complaining about their conditions of confinement. *See, e.g.*, *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012); *Walker v. Thompson*, 288 F.3d 1005 (7th Cir. 2002); *DeWalt v. Carter*, 224 F.3d 607 (7th Cir. 2000); *Babcock v. White*, 102 F.3d 267 (7th Cir. 1996); *Cain v. Lane*, 857 F.2d 1139 (7th Cir. 1988). The issue in a retaliation claim is whether the plaintiff experienced an adverse action that would likely deter a person of "ordinary firmness" from engaging in First Amendment activity in the future, and if the First Amendment activity was "at least a motivating factor" in the defendant's decision to take the retaliatory action. *See McKinley v. Schoenbeck*, __ F. App'x __, No. 17-1709, 2018 WL 1830942 at *3 (7th Cir. Apr. 17, 2018) (quoting *Surita v. Hyde*, 665 F.3d 860, 878-79 (7th Cir. 2011)); *Bridges v. Gilbert*, 557 F.3d 541, 551 (7th Cir. 2009). "A complaint states a claim for retaliation when it sets forth 'a chronology of events from which retaliation may plausibly be inferred.'" *Zimmerman v. Tribble*, 226 F.3d 568, 573 (7th Cir. 2000) (citation omitted).

In this case, Plaintiff asserts that soon after he filed his PREA complaint and grievances against Mahan, at least one of which was reviewed by Sterrett, Sterrett revoked Plaintiff's permission to attend 2 Protestant services which Sterrett had previously approved. This sequence of events strongly suggests a retaliatory motive. Moreover, after Plaintiff filed a grievance against Sterrett for removing him from those 2 services, Sterrett terminated Plaintiff's participation in a third Protestant service. Sterrett's explanation that Plaintiff was removed from those Protestant services because Plaintiff identified himself as Catholic appears

to be pretextual, when viewed in the context of Plaintiff's longtime participation in non-Catholic services with the approval of Sterrett and other chaplains.

**Count 1** against Sterrett may therefore proceed for further consideration.

### Count 2 – Conspiracy to Retaliate

Civil conspiracy claims are cognizable under § 1983. *See Lewis v. Washington*, 300 F.3d 829, 831 (7th Cir. 2002) (recognizing conspiracy claim under section 1983). "[I]t is enough in pleading a conspiracy merely to indicate the parties, general purpose, and approximate date . . . ." *Walker v. Thompson*, 288 F.3d 1005, 1007-08 (7th Cir. 2002). *See also Hoskins v. Poelstra*, 320 F.3d 761, 764 (7th Cir. 2003); *Tierney v. Vahle*, 304 F.3d 734, 740 (7th Cir. 2002).

Here, Plaintiff brought complaints against Mahan and Sterrett in April 2018, based on Mahan's harassment and incitement to violence against Plaintiff, and Sterrett's response to Plaintiff's complaints. Plaintiff's allegations were reviewed by Walker and Pickford. Plaintiff asserts that Pickford told Walker, Sterrett, and Mahan about Plaintiff's accusations against Mahan. Sterrett, Mahan, Walker, Pickford, and Dennison allegedly conspired to take the adverse action against Plaintiff of excluding him from the Protestant religious services which he had attended faithfully for many years, in order to punish him for bringing his PREA complaints and grievances. (Doc. 1, p. 24). Furthermore, Plaintiff asserts that the other Defendants "turned a blind eye" to Mahan's ongoing harassment targeting LGBT inmates, allowing Mahan's misconduct to continue unchecked.

(Doc. 1, p. 28). These allegations satisfy the pleading requirements of § 1915A at this early stage.

Moreover, Plaintiff has stated a cognizable claim for § 1985(3) conspiracy, which may include Defendant Mahan, the volunteer chaplain, if he is deemed to be a non-state actor. "[T]he function of a conspiracy claim under 42 U.S.C. § 1985(3) is to 'permit recovery from a private actor who has conspired with state actors.'" *Turley v. Rednour*, 729 F.3d 645, 649 n.2 (7th Cir. 2013) (quoting *Fairley v. Andrews*, 578 F.3d 518, 526 (7th Cir. 2009)).

Accordingly, **Count 2**, including claims for conspiracy under § 1983 and § 1985(3), shall proceed for further consideration against Sterrett, Walker, Pickford, Dennison, and Mahan.

### Count 3 – First Amendment/Free Exercise and RLUIPA

It is well-established that "a prisoner is entitled to practice his religion insofar as doing so does not unduly burden the administration of the prison." *Hunafa v. Murphy*, 907 F.2d 46, 47 (7th Cir. 1990); *see Al-Alamin v. Gramley*, 926 F.2d 680, 686 and nn. 3-5 (7th Cir. 1991) (collecting cases). On the other hand, a prison regulation that impinges on an inmate's First Amendment rights is nevertheless valid "if it is reasonably related to legitimate penological interests." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). Such interests include inmate security and the proper allocation of limited prison resources. *See id.* at 348, 352-53; *Turner*, 482 U.S. at 90; *Al-Alamin*, 926 F.2d at 686.

Restrictions on access to religious services and other opportunities are reviewed in light of four factors: (1) whether there is a valid and rational connection between the regulation prohibiting access and a legitimate governmental interest to justify it; (2) whether there are alternative means of exercising the right to practice religion that remain open to inmates; (3) whether accommodation of the right to practice would have a significant impact on prison staff or other inmates; and (4) whether the regulation is reasonable in terms of allowing prisoners use of available alternatives. *Turner*, 482 U.S. 78; *see also Beard v. Banks*, 548 U.S. 521 (2006).

In Plaintiff's case, he was permitted to attend a variety of Christian chapel and religious services for over 30 years during his incarceration, in addition to the services offered specifically for inmates of his particular affiliation (initially Baptist, and later Catholic). Only recently, after he complained about Mahan's harassment, was Plaintiff prohibited from participation in additional services beyond the once-per-week Catholic mass. This action by Sterrett, allegedly in cooperation/conspiracy with the other Defendants, may not survive scrutiny under the *Turner* factors. Accordingly, Plaintiff has stated a cognizable claim for violation of his First Amendment right to freely exercise his religious beliefs by attending prison-sanctioned worship services.

Plaintiff's RLUIPA claim overlaps with his First Amendment claim. Notably, the RLUIPA, which is directed at institutions receiving federal financial assistance, provides greater protections than the First Amendment. *See Schlemm*

v. Wall, 784 F.3d 362, 363 (7th Cir. 2015); 42 U.S.C.A. § 2000cc-1. "Under the Act, if an inmate shows that an institutional policy substantially burdens his religious exercise, then that policy may not be applied unless the institution shows that the policy is the least restrictive means for advancing a compelling state interest." Tanksley v. Litscher, No. 17-2867, __ F. App'x __, 2018 WL 2316923 at *1 (7th Cir. May 22, 2018) (citing 42 U.S.C.A. § 2000cc-1; Holt v. Hobbs, 135 S. Ct. 853, 863 (2015)).

Money damages are not available in a RLUIPA suit against state employees in their official capacity, nor does RLUIPA authorize any kind of relief against public employees. Vinning-El v. Evans, 657 F.3d 591, 592 (7th Cir. 2011) (citing Sossamon v. Texas, — U.S. —, 131 S. Ct. 1651 (2011); Will v. Michigan Department of State Police, 491 U.S. 58 (1989); Nelson v. Miller, 570 F.3d 868 (7th Cir. 2009)). However, a court may order injunctive relief to correct a violation of the RLUIPA. 42 U.S.C.A. § 2000cc-2.

Plaintiff's First Amendment claim in **Count 3** shall proceed for further consideration against all Defendants. The RLUIPA portion of **Count 3** shall proceed against Chaplain Sterrett and Warden Dennison, in their official capacities, as the officials who would be responsible for implementing any injunctive relief to which Plaintiff may be entitled. See Gonzalez v. Feinerman, 663 F.3d 311, 315 (7th Cir. 2011) (proper defendant in a claim for injunctive relief is the government official responsible for ensuring any injunctive relief is carried out).

**Count 4 – Equal Protection**

Finally, Plaintiff asserts that by excluding him from non-Catholic religious services, Sterrett treated him differently from other similarly situated Catholic inmates, whose participation in religious services is not restricted only to Catholic events. This may be characterized as a "class of one" equal protection claim.

The Equal Protection Clause of the Fourteenth Amendment protects against governmental discrimination, typically on the basis of race, gender, national origin, or religion. The Clause also prohibits a government official from singling out a person for different treatment for no rational reason. "To state a class-of-one equal protection claim, an individual must allege that he was 'intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Swanson v. City of Chetek*, 719 F.3d 780, 783-84 (7th Cir. 2013) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). In order to determine whether the defendant had an improper motive for the differential treatment, courts review the manner in which similarly situated individuals were treated. If the relevant principal characteristics of the plaintiff and other individuals are the same, but others received more favorable treatment, this may indicate the absence of proper motivation for the disparate treatment. *See Geinosky v. City of Chicago*, 675 F.3d 743, 748 (7th Cir. 2012).

This is exactly what Plaintiff alleges here – his participation in non-Catholic religious services was terminated by Sterrett, purportedly because of his Catholic affiliation. At the same time, other Catholic inmates continued to participate in

15

non-Catholic services without restriction. Based on this factual scenario, Plaintiff may pursue the equal protection claim in **Count 4** against Sterrett.

### Pending Motions

Plaintiff's motion for leave to proceed *in forma pauperis* (Doc. 2) demonstrates that he is indigent. A separate order shall be entered granting this motion and ordering payment of the $350.00 filing fee in installments according to 28 U.S.C. § 1915(b).

Plaintiff's motion for TRO and Preliminary Injunction (Doc. 3) requests an order to compel Defendants to immediately place Plaintiff back on the list permitting him to attend the 3 Protestant religious services that he had been attending for 20 months at Shawnee until April 10, 2018. This motion shall be referred to a United States Magistrate Judge for prompt consideration.

### Disposition

Pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c), the motion for TRO and Preliminary Injunction (Doc. 3) is hereby **REFERRED** to a United States Magistrate Judge, who shall resolve the request for injunctive relief as soon as practicable, and issue a report and recommendation. Any motions filed after the date of this Order that relate to the request for injunctive relief or seek leave to amend the complaint are also hereby **REFERRED** to the United States Magistrate Judge.

**IT IS FURTHER ORDERED** that the Clerk of Court shall take appropriate steps in coordination with the U.S. Marshals Service, to effect formal, **PERSONAL**

**SERVICE** of summons, the Complaint, the motion at Doc. 3, and this order upon each Defendant at his or her work address, as provided by Plaintiff. The Court will not require Defendants to pay the full costs of formal service, as the Court is ordering personal service to expedite the resolution of Plaintiff's motion for a TRO/preliminary injunction.

The United States Marshals Service is **APPOINTED** pursuant to Federal Rule of Civil Procedure 4(e) to effect service. The Clerk is **DIRECTED** to complete, on Plaintiff's behalf, a summons and form USM-285 for service of process on Defendants **DENNISON, WALKER, PICKFORD, STERRETT,** and **MAHAN.** The Clerk shall issue the completed summons, and prepare a service packet for each Defendant consisting of: the completed summons, the completed form USM-285, a copy of the complaint (Doc. 1), a copy of the motion for TRO/preliminary injunction (Doc. 3), and this Memorandum and Order. The Clerk shall deliver the service packets for each Defendant to the United States Marshals Service for personal service on each Defendant.

Pursuant to Federal Rule of Civil Procedure 4, **within 14 days of the date of this Order**, the United States Marshals Service **SHALL PERSONALLY SERVE** upon Defendants **DENNISON, WALKER, PICKFORD, STERRETT,** and **MAHAN,** the service packets containing the summons, form USM-285, a copy of the complaint (Doc. 1), a copy of the motion for TRO/preliminary injunction (Doc. 3), and this Memorandum and Order. **LEAVING THE SUMMONS WITH THE PRISON'S LITIGATION COORDINATOR IS NOT SUFFICIENT – each**

**Defendant must be personally served**. All costs of service shall be advanced by the United States, and the Clerk shall provide all necessary materials and copies to the United States Marshals Service.

In order to assist the Court in its resolution of the motion for preliminary injunctive relief (Doc. 3), Defendants **DENNISON, WALKER, PICKFORD, STERRETT,** and **MAHAN SHALL FILE A RESPONSE** to the motion within 14 days of the date of service of the summons.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the complaint and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g).

Pursuant to Local Rule 72.1(a)(2), this action is **REFERRED** to a United States Magistrate Judge for further pre-trial proceedings, which shall include a report and recommendation on the pending motion for TRO & Preliminary Injunction (Doc. 3) as soon as practicable.

Further, this entire matter shall be **REFERRED** to the United States Magistrate Judge for disposition, pursuant to Local Rule 72.2(b)(2) and 28 U.S.C. § 636(c), *if all parties consent to such a referral.*

If judgment is rendered against Plaintiff, and the judgment includes the payment of costs under § 1915, Plaintiff will be required to pay the full amount of the costs, notwithstanding that his application to proceed *in forma pauperis* shall be granted. *See* 28 U.S.C. § 1915(f)(2)(A).

Finally, Plaintiff is **ADVISED** that he is under a continuing obligation to

keep the Clerk of Court and each opposing party informed of any change in his address; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than **7 days** after a transfer or other change in address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution. *See* FED. R. CIV. P. 41(b).

**IT IS SO ORDERED.**

Judge Herndon
2018.05.30
15:38:34 -05'00'

United States District Judge