**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

CHARLES DENT,                                 )
                                              )
                    Plaintiff,                )
                                              )
vs.                                           )       Case No. 3:18 -CV-01156 -MAB
                                              )
JEFFREY M. DENNISON, ET AL.,                  )
                                              )
                    Defendants.               )

# MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

Plaintiff Charles Dent, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), alleges First and Fourteenth Amendment claims, as well as a Religious Land Use and Institutionalized Persons Act ("RLUIPA") claim against Defendants, detailing that they retaliated and conspired against him by excluding him from religious services (Doc. 1). Now before the Court is Defendants Jeffrey M. Dennison, Jerid Pickford, Samuel Sterrett, Lu Walker, and Lance Mahan's motion and supporting memorandum for summary judgment (Docs. 74, 75). For the reasons set forth below, the Court grants in part and denies in part Defendants' motion for summary judgment.

## PROCEDURAL BACKGROUND

Plaintiff filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 on May 24, 2018 (Doc. 1). Following a threshold review of the complaint pursuant to 28 USC § 1915A, Plaintiff was permitted to proceed on four claims:

**Count 1**      Sterrett retaliated against Plaintiff in violation of the First Amendment by revoking Plaintiff's permission to attend 3 Protestant religious services at Shawnee, in which Plaintiff had been participating for years at Shawnee and at other prisons, after Plaintiff filed a PREA[1] complaint and grievances against Mahan and Sterrett;

**Count 2**      Defendants conspired to retaliate against Plaintiff by excluding him from religious services after Plaintiff filed a PREA complaint and grievances against Mahan for exhorting other inmates to inflict violence on Plaintiff and other LGBT inmates, and filed complaints against Sterrett;

**Count 3**      Defendants violated Plaintiff's rights under the First Amendment and the RLUIPA to freely exercise his religious beliefs, by excluding him from religious services in which he had regularly participated for years;

**Count 4**      Sterrett violated Plaintiff's Fourteenth Amendment right to equal protection by terminating him from participation in non-Catholic religious services, while other Catholic inmates were allowed to participate in non-Catholic services.

(Doc. 5).

## FACTUAL BACKGROUND

I.      Parties

Plaintiff is currently incarcerated at Graham Correctional Center ("Graham"), but at the time of the events alleged in his complaint, he was incarcerated at Shawnee (Doc. 74, p. 2).

Defendant Sterrett was the Chaplain at Shawnee. His duties included oversight for all of the religious programs and counseling for all of the prisoners. Additionally, he oversaw scheduling of the programming and "all aspects dealing with religious programs and activities at the chapel" (Doc. 74-7, p. 16). Defendant Dennison was the

---

[1] PREA stands for the Prison Rape Elimination Act.

Chief Administrative Officer. Defendant Walker was the Assistant Warden of Shawnee. Defendant Pickford was the head of Internal Affairs ("IA") at Shawnee and investigated the PREA incident outlined in Plaintiff's complaint (Doc. 74-1, p. 4). Defendant Mahan was a volunteer chaplain at Shawnee for Protestant Services (*Id.* at p. 4-6).

## II.    Timeline of Events

Plaintiff has been a practicing protestant (specifically, Baptist) for over forty years, both in and out of prison (Doc. 76, p. 16). In July 2009, he changed his religious affiliation to Catholic (*Id.*). He testified that he changed from Baptist to Catholic because there was a long waiting list for Baptist services while he was incarcerated at Centralia (Doc. 74-1, p. 5). He has continued to be registered as Catholic since that time (Doc. 74, p. 2; 74-1; 74-2). Plaintiff has been at numerous other IDOC facilities and testified that he was allowed to attend both Catholic and Protestant services at many of them (Doc. 74-7, pp. 7-9).

On May 10, 2016, Plaintiff arrived at Shawnee (Doc. 76, p. 16). On or around June 2016, Plaintiff requested to attend Protestant services at Shawnee, pursuant to the Illinois Administrative Code 425.30(g) (Doc. 76, p. 16). Soon after, he was approved to attend Protestant services held on Sunday at Shawnee (*Id.*). These services were led by Defendant Mahan (Doc. 74-1, p. 6).

In March 2018, Plaintiff submitted a written request to go to an additional Protestant service. Specifically, Plaintiff asked Defendant Sterrett to attend Friday night Protestant services (Doc. 76, p. 16).[2] Plaintiff was already attending Catholic Mass on

---

[2] The main identifier for an inmate's religion is their self-proclaimed religion within IDOC records (Doc. 74-6, p. 27). Defendant Sterrett testified that if a prisoner wants to attend an activity for a religion that does

Tuesday mornings and two Protestant services and so with this request, he was asking to attend four total (*Id.*). At the end of March 2018 or the beginning of April 2018, Defendant Sterrett approved Plaintiff to attend the Friday night Protestant service (Doc. 76, p. 16, 26; 74-7, pp. 20-21).

On April 7, 2018, Plaintiff filed a grievance against a volunteer priest, Defendant Mahan, who presided over Protestant services (Doc. 74-2, p. 30; 76, p. 17). This grievance detailed that Defendant Mahan was preaching about his hatred for homosexual, transgender, and other inmates who identify as part of the LGBTQ[3] community. Plaintiff details in his grievance that Defendant Mahan pointed out specific prisoners who identify as members of the LGBTQ community, including Plaintiff (Doc. 76, pp. 23-24). During service on April 7, 2018, the same day as the grievance, Defendant Mahan kicked Plaintiff out of services because he was talking (Plaintiff says he was not) (*Id.*). According to Plaintiff, Defendant Mahan kicked out prisoners who identify as LGBTQ community members from services under the pretext that they are talking (*Id.* at p. 24). Plaintiff states that Defendant Mahan was inciting violence against inmates who identify as LGBTQ during his sermon, so he asked for Defendant Mahan to be banned from presiding over religious services at Shawnee (*Id.* at p. 23).

---

not match their self-proclaimed religion, they must submit a written request to the chaplain, who will then make a decision, "taking into consideration…the religious affiliation of the offender…and if there could be a safety or security issue" (Doc. 74-7, pp. 17-18).

[3] Plaintiff details in his filings that Defendant Mahan specifically targeted homosexual and transgender inmates, as well as those who identify as "LGBTQ," which stands for Lesbian, Gay, Bisexual, Transgender, and Queer. Recent cases in this district refer to this community simply as "LGBTQ." *See generally Garcia v. Funk*, No. 18-cv-1001-RJD, 2020 WL 5801908 (S.D. Ill. Sept. 29, 2020). As such, the undersigned will refer to this community as "LGBTQ" throughout this Order.

Plaintiff submitted this grievance as a non-emergency to his counselor who received the grievance on April 10, 2018 (*Id.*). It was then sent to Defendant Sterrett, who issued a short response on April 11, 2018, stating that the substance of the grievance warranted referral to Internal Affairs ("IA") to do a PREA investigation (*Id.* at p. 25). The grievance was then sent to Defendant Pickford, an IA supervisor, who is assigned to investigate PREA complaints (*Id.* at p. 17).

Plaintiff was interviewed about the PREA complaint by Defendant Pickford who then completed an Incident Report. The Incident Report says that Plaintiff "felt that he was being sexually harassed and that Mahan was creating a hostile environment for homosexuals" (*Id.* at p. 74). After the interview, Defendant Pickford took Plaintiff to the Health Care Unit to offer him mental health and medical services (*Id.*).

On April 14, 2018, Plaintiff received his weekly activity card, where he discovered that he was removed from Tuesday and Friday night Protestant services by Defendant Sterrett (*Id.* at pp. 17, 27-28). At this time, Plaintiff was still assigned to the Catholic Mass on Tuesday and the Sunday Protestant Service (*Id.*).

On April 14, 2018, Plaintiff filed a grievance against Defendant Sterrett for retaliation since Plaintiff believed he was responsible for taking him off of Protestant services on Tuesdays and Fridays after Plaintiff filed his April 7, 2018 grievance (*Id.* at p. 17). This grievance also details Plaintiff's PREA complaint on April 10, 2018 (*Id.* at p. 33). Plaintiff asked to be placed on Tuesday and Friday chapel services immediately, and for Defendant Mahan to be suspended (*Id.*). This grievance was filed as a non-emergency, and was sent to Plaintiff's counselor who responded on April 18 with, "See grievance

response from Chaplain Sterrett attached dated 4/18/18" (*Id.*). There does not appear to be a copy of Defendant Sterrett's response to this grievance in the record. This grievance was stamped as "received" by the Administrative Review Board ("ARB") on May 21, 2018. The ARB response states that the issue was appropriately addressed, as during the PREA investigation, it was realized that "numerous offenders were attending chapel services that were not of their designated religion. Those offenders found to be attending the wrong religious services were removed" (*Id.* at p. 37).

On April 21, 2018, Plaintiff received his activity card and discovered that Defendant Sterrett had revoked his last Protestant service on Sunday (*Id.* at p. 18, 35). Defendant Sterrett previously testified that Plaintiff and less than 20 other prisoners were removed from the Protestant chapel line around this time due to his review of all chapel lines to "make sure that all assigned participants were compliant with 425" (Doc. 74-7, p. 21).[4] [5] Soon after, Defendant Sterrett testified that he also reviewed other chapel lines for compliance, including a Jehovah Witness chapel line (*Id.* at p. 25).

Defendants contend that Plaintiff was removed from Protestant services because he was previously allowed to attend as a "mistake," which was only discovered after the PREA investigation (*Id.* at p. 20-22). Multiple other prisoners were also taken off of the

---

[4] At the outset of this case, Plaintiff filed a motion for preliminary injunction. The Court held a hearing on this motion on May 24, 2018 at which time both Plaintiff and Defendant Sterrett testified (Doc. 25).

[5] 425 refers to a provision within the Illinois Department of Corrections Administrative Directive that provided at the time in question that inmates may only be permitted to attend regularly scheduled non-denominational religious activities or religious activities for the specific faith group the inmate has designated as their religious affiliation. The senior chaplain reviews all prisoner requests to attend religious activities outside the inmates self-identified religious affiliation (Doc. 74-4).

Protestant chapel services around this time after the chapel lines were reviewed for accuracy with the listed denomination for each prisoner (*Id.* at p. 21). Defendants contend that Plaintiff was disruptive during services at various times, and the safety and security of the institution is "at risk" if an offender is socializing and not paying attention (or is disruptive) during services (*Id.* at p. 26). Defendant Sterrett testified that volunteers who run the services reported that Plaintiff had been disruptive of the services at various points (*Id.*).

On April 28, 2018, Plaintiff filed an emergency grievance, detailing that Defendants Pickford, Walker, and Sterrett retaliated against plaintiff for filing a PREA complaint by removing him from religious services (Doc. 76, p. 31). He asks to have his religious services reinstated and an investigation into the retaliation claim he makes in this grievance (*Id.*). The warden reviewed this grievance on May 7, 2018 and deemed it a non-emergency. It was then forwarded to Plaintiff's counselor, who wrote a response on May 14, 2018 at the direction of Defendant Sterrett (*Id.*). The response reads as follows:

> Offender self-identified religion is Catholic according to file. Offenders may only attend the religious activities of their designated religion or non-denominational religious activities. Any action conducted by SCC staff was in compliance with Il. Law Code 20.435.30.

Plaintiff filed another emergency grievance about these issues on May 10, 2018, in which he described that Defendants Mahan, Walker, Pickford, Sterrett violated his Frist Amendment rights to file a PREA complaint and are retaliating against him. He also states that they are interfering with his right to practice his religion (*Id.* at p. 29). Although filed as an emergency, there are no notes that this grievance was reviewed by the warden;

rather, it appears that it was only reviewed by Plaintiff's counselor on May 17, 2018 and returned to Plaintiff as a "duplicate grievance" (*Id.*). In the body of the grievance, plaintiff writes that he is sending it directly to the ARB as the warden has "refused to process his emergency grievance" (*Id.* at p. 30). This grievance was reviewed by the ARB on May 30, 2018 and returned to plaintiff with the indication that "the issue will not be addressed further," as there was not any new information provided by plaintiff to warrant further review after the ARB reviewed two prior grievances (dated May 8 and 3, 2018) (*Id.* at pp. 62-68).

Plaintiff submitted the declarations and supporting materials from three other prisoners who aver that they have experienced similar discriminatory actions by Defendants. The first, from a Ms. Anthony ("Nina") Spoden[6], details that during chapel services in March 2018, Spoden observed Defendant Mahan allow another prisoner to approach the podium during services and preach "hateful remarks towards LGBT inmates…as well as advocate violence against them" (*Id.* at p. 38). When Spoden requested Defendant Mahan to intervene, Defendant Mahan responded, "he was only speaking God's word" (*Id.*). Spoden was interviewed by IA following Plaintiff's PREA complaint and avers that she and Plaintiff were then removed from chapel services while the inmate previously mentioned and Defendant Mahan were not (*Id.* at p. 39). Soon after, Spoden was removed from all chapel services, as she had not designated a specific religion previously (*Id.*). When questioned as to why Spoden was removed, Defendant

---

[6] Spoden identifies as transgender (Doc. 76, p. 19). Accordingly, the Court will use the female pronouns of "she" and "her."

Sterrett responded that it was because Spoden had not designated a specific religion. Spoden completed the designated religion form, but told she needed to fill out the DOC Chaplain Worksheet (*Id.*). On April 25, 2018, Spoden filled out the "Request to Change Religious Affiliation" form from "no religion" to "protestant" (*Id.* at p. 41). This request was denied by Defendant Sterrett on April 30, 2018, as Spoden was a "no show for completing sincerity worksheet" (*Id.*). Spoden followed up with Defendant Sterrett and requested another sincerity worksheet, and ultimately was reassigned to her requested chapel line on or around June 21, 2018 (the delay was due to some internal logistical issues, not relevant here) by Defendant Sterrett (*Id.* at p. 43).

Plaintiff also submitted a declaration from Anthony E. Galvan (*Id.* at p. 45). In March 2018, he was designated as Catholic, but attended both Catholic and Protestant services by providing a request slip to Defendant Sterrett (*Id.*). On or around June 15, 2018, Galvan was removed from attending Protestant services by Defendant Sterrett (*Id.* at p. 46). There is also a copy of a grievance he filed against Defendant Sterrett for his removal from Protestant services, dated July 15, 2018 (*Id.* at pp. 47-49). In his response, Defendant Sterrett stated that he was removed from Protestant services as part of a review process "of all chapel lines for compliance with Illinois Code 20, 425D.30 (f)." He explained the review was conducted to correct employee errors and that Galvan was not the only offender who has been removed from Protestant chapel lines, so the decision was not retaliatory (*Id.* at p. 49).

Lastly, Plaintiff submitted the declaration and supporting documentation from a third prisoner, David P. Carrasco who avers that he is listed as Catholic on his religious

affiliation form through the IDOC (*Id.* at p. 50). In April 2018, Carrasco was approved for two Protestant religious services by Defendant Sterrett (*Id.*). And as of May 2018, he was still attending both Catholic Mass and Protestant services and had not had the Protestant services revoked (*Id.*).

Plaintiff also submitted a series of activity cards from five other prisoners. These activity cards are all from prisoners who are designated as Catholic, but who attend both Catholic and Protestant services throughout the week (*Id.* at pp. 56-60). The takeaway, according to Plaintiff, is that the only Catholic prisoners who had their extra Protestant services taken away were Spoden and Galvan, and others, who had assisted Plaintiff in some way in his PREA complaint or grievances.

On or around September 1, 2018, Defendant Sterrett transferred to Menard from Shawnee (*Id.* at p. 20). Soon after, Correctional Officer Cole was assigned to Chaplain duties at Shawnee (*Id.*). Correctional Officer Cole informed Plaintiff that he would approve Protestant services for him (*Id.*). Plaintiff was reinstated in Protestant Services, as indicated by his September 8, 2018 activity card, which indicated that he is Catholic and attends four Protestant services and one Catholic service per week (*Id.* at 61). According to Plaintiff, on or around September 5, 2018, Defendant Walker spoke with Plaintiff and apologized for revoking his Protestant services attendance, informing him that she had to "back former Chaplain Sterrett's revo[cation]" (*Id.* at p. 20). Plaintiff testified that once he was allowed to attend Protestant sessions with Defendant Mahan in September, Mahan did not preach about anything negative related to the LGTBQ

community (Doc. 74-1, p. 7). On or around October 17, 2018, Plaintiff was transferred to Graham, where he attends multiple Catholic and Protestant Services (Doc. 76, p. 20).

## LEGAL STANDARD

Summary judgment is proper when the moving party "shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted). In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter, and the court may not "choose between competing inferences or balance the relative weight of conflicting evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014)(citations omitted); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). Instead, "it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen*, 763 F.3d at 836.

## DISCUSSION

I.    Count 1—Defendant Sterrett Retaliated Against Plaintiff

At the summary judgment stage, the plaintiff has the initial burden to make out a prima facie case of retaliation by showing that: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation likely to deter such activity; and (3)

the First Amendment activity was at least a motivating factor in the decision to impose the deprivation." *Hawkins v. Mitchell*, 756 F.3d 983, 996 (7th Cir. 2014) (citing *Thayer v. Chiczewski*, 705 F.3d 237, 251 (7th Cir. 2012)). The prisoner must "cite the facts which [he] believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015) (citations omitted). "If the movant has failed to make this initial showing, the court is obligated to deny the motion." *Id.* (citing *Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 662 (7th Cir. 2011) ("A party opposing summary judgment does not have to rebut factual propositions on which the movant bears the burden of proof and that the movant has not properly supported in the first instance.") and *Johnson v. Gudmundsson*, 35 F.3d 1104, 1112 (7th Cir. 1994) (even an unanswered motion for summary judgment cannot be granted unless the movant has shown that the facts warrant judgment in its favor)). On the other hand, if the prisoner succeeds in making the initial showing, then the burden shifts to the defendants to show that they would have taken the same action in the absence of the protected conduct. *Thayer, 705 F.3d at 252; Kidwell v. Eisenhauer,* 679 F.3d 957, 965 (7th Cir. 2012); *Greene*, 660 F.3d at 980. If the defendants fail to counter the prisoner's evidence, then the defendants' retaliatory actions are considered a "necessary condition" of the prisoner's harm, and the prisoner has established the "but-for" causation needed to succeed on his claim. *Kidwell*, 679 F.3d at 965.

The Court now turns to the question of whether the evidence before it is sufficient to establish that the alleged retaliation was the sort that would "deter a person of ordinary

firmness" from exercising his or her First Amendment rights. *Bridges v. Gilbert*, 557 F.3d 541, 555 (7th Cir. 2009).

Plaintiff contends that Defendant Sterrett violated his First Amendment rights by revoking his permission to attend Protestant religious services at Shawnee after he filed a PREA grievance and subsequent grievances against both Defendants Mahan and Sterrett. It is well-settled that an inmate has a constitutional right to file a grievance as part of his right of access to the courts under the First Amendment. *See DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000).[7] It is clear that Plaintiff engaged in a protected First Amendment right by filing his grievance. The Court then turns to the second prong and whether he suffered a deprivation that likely deterred this activity. Plaintiff argues this deprivation was being removed from Protestant services. The timing of his removal is certainly suspicious. He filed his first grievance against Defendant Mahan and then was removed from two out of the three Protestant services he attended (Doc. 76, pp. 14-15). Then, he filed a second grievance against Defendant Sterrett for this removal and a week later, was removed from his last Protestant service (*Id.* at p. 18, 35).

While Plaintiff did file a few more grievances after he was removed from three out of his four religious services, he submitted evidence that he did not send in an additional request to Defendant Sterrett to ask to be reinstated in Protestant services, as he believed it to be futile (*Id.* at p. 4; 74-2, p. 9). In fact, in Plaintiff's grievances, he asked to be

_____

[7] Defendants do not address this argument directly in their motion for summary judgment; rather, they argue that Plaintiff's First Amendment right to the free exercise of religion was not burdened (Doc. 74, pp. 6-7). The threshold Order in this matter (entered on May 30, 2018) was clear, though, that this claim relates to retaliation for filing grievances (*See* Doc. 5, p. 10).

reinstated in Protestant services, and Defendant Sterrett refused in his responses to Plaintiff (*See,* e.g., Doc. 76, pp. 18, 35). In addition, Plaintiff submitted declarations from other prisoners who helped him file his PREA grievance, and subsequent grievances, who were also removed from religious services after participating in the grievance procedure. And he submitted evidence that a Catholic prisoner (Carrasco), who did not help with him with his grievances and never had his additional Protestant services revoked.

Defendants counter Plaintiff's assertions by arguing that Defendant Sterrett engaged in an internal review of all chapel lines after Plaintiff filed his grievance, and he was not the only prisoner removed from certain chapel lines. Additionally, Defendants argue, essentially, that the burden was on Plaintiff to submit an additional request to Defendant Sterrett to be reinstated in the Protestant chapel lines if he wished to attend more than one chapel line (Doc. 74, p. 8); however, these arguments are unavailing in light of Plaintiff's evidence showing inconsistent enforcement of Defendant Sterrett's review of chapel lines.

To establish a retaliation claim, the prisoner must show that his own activity was constitutionally protected, and that his conduct was a factor motivating the prison officials challenged actions. *Irby v. Siedschlag*, 160 F. App'x 499, 501 (7th Cir. 2005), citing to *Babcock v. White*, 102 F.3d 267, 275 (7th Cir.1996). When viewing the evidence in the light most favorable to Plaintiff, he establishes that he engaged in a constitutionally protected activity by filing grievances and suffered harm because of this protected activity. Defendants did not submit any evidence to counter Plaintiff's submissions of

other prisoners' declarations and, as such, the Court considers Defendant Sterrett's actions a "necessary condition" of Plaintiff's harm. Accordingly, he has established the "but-for" causation required to survive summary judgment on this claim. *Kidwell*, 679 F.3d at 965.

II.   <u>Count 2—Defendants conspired to retaliate against Plaintiff</u>

While civil conspiracy claims are cognizable under § 1983, *see Lewis v. Washington*, 300 F.3d 829, 831 (7th Cir. 2002), conspiracy is not an independent basis of liability in § 1983 actions. *See Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008) (citing *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 423 (7th Cir. 2000)). "For liability under § 1983 to attach to a conspiracy claim, defendants must conspire to deny plaintiffs their constitutional rights." *Hill v. Shobe*, 93 F.3d 418, 422 (7th Cir. 1996). Thus, in order to succeed on his conspiracy claim, Plaintiff must demonstrate: (1) that Defendants Dennison, Pickford, Sterrett, Walker, and Mahan had an express or implied agreement to deprive him of his constitutional rights, and (2) that he was actually deprived of his constitutional rights by Defendants' overt actions in furtherance of the agreement. *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015) (citing *Scherer v. Balkema*, 840 F.2d 437, 441-42 (7th Cir. 1998)).

Plaintiff claims that Defendants conspired to retaliate against him by excluding him from religious services. Plaintiff presented evidence that some of these Defendants, specifically Walker and Mahan, made comments to suggest that they supported one another's decisions in dealing with Plaintiff (*e.g.*, another prisoner communicated to Plaintiff that he asked Defendant Mahan to stop harassing Plaintiff and, in response, Defendant Mahan said something to the effect of, "No, I'm not worried about it…he was

saying that he spoke to Ms. Walker, and everything that he was doing already. She rocking with him.") (Doc. 74-2, p. 13). However, the evidence does not seem to indicate the Defendants had an express or implied agreement.

Additionally, Plaintiff argued that he was reinstated in his additional Protestant services only after Defendant Sterrett left Shawnee and after he met with Defendant Walker, who apologized for revoking his Protestant services attendance, and informed him that she had to "back former Chaplain Sterrett's revo[cation]" (Doc. 76, p. 20). As added support, Plaintiff points to his grievances, which were answered by Defendants Sterrett, Pickford, and Walker, as evidence that they engaged in a conspiracy to retaliate against him by excluding him from Protestant services at Shawnee.

As an initial matter, Plaintiff has failed to provide *any* evidence that Defendant Dennison was involved in any form of a conspiracy, as he has not presented any evidence that Defendant Dennison was even aware of the issues he was experiencing at Shawnee. Although Defendants Pickford, Sterrett, Walker, and Mahan were either the subject of Plaintiff's grievances and/or responded to some of the grievances, there is absolutely nothing in the record to indicate that they had an express or implied agreement to deprive Plaintiff of his constitutional rights. Rather, the evidence suggests that Defendants Mahan, Pickford, and Walker did not go against Defendant's Sterrett's decision to remove Plaintiff from Protestant services, as the Administrative Code outlines that this decision was solely within the purview of Defendant Sterrett through his position as chaplain (Doc. 74-4, pp. 3-4).

As there is a dearth of evidence to support Plaintiff's conspiracy claim in the record, the Court finds that no reasonable juror could conclude from Plaintiff's evidence that Defendants conspired against him. Accordingly, the Court grants Defendant's motion for summary judgment on this claim.

III.   Count 3—Defendants violated Plaintiff's rights under the First Amendment and RLUIPA

Both the Free Exercise Clause of the First Amendment and RLUIPA protect an inmate's right to practice his or her religion. Specifically, the Free Exercise Clause prohibits a prison from imposing a "substantial burden" on a "central religious belief or practice," unless the burden is reasonably related to a legitimate penological objective. *Kaufman v. Pugh*, 733 F.3d 692, 696 (7th Cir. 2013). A legitimate penological objective includes safety, security, and economic concerns. *Ruby v. Sevier*, No. 3:18-CV-890-JD-MGG, 2021 WL 736212, at *4 (N.D. Ind. Feb. 25, 2021) (citing *Turner v. Safley*, 482 U.S. 78, 89-91 (1987)).

RLUIPA imposes a higher standard and prohibits a prison from imposing a "substantial burden" on an inmate's religious exercise unless the burden furthers "a compelling governmental interest" and does so by "the least restrictive means." 42 U.S.C. § 2000cc–1(a)(1)–(2); *Koger v. Bryan*, 523 F.3d 789, 796 (7th Cir. 2008). Although money damages and injunctive relief are available under the First Amendment, only injunctive relief is available under RLUIPA. *Ruby*, 2021 WL 736212 (N.D. Ind. Feb. 25, 2021) (citing *Sossamon v. Texas*, 563 U.S. 277, 285 (2011)). So, as an initial matter, Defendants' motion for summary judgment will be granted as to the RLUIPA claims, as Plaintiff is no longer

housed at the same institution as Defendants and, therefore, there is no relief for Plaintiff under RLUIPA.

In order to survive summary judgment on a First Amendment claim, the prisoner must raise a material question of fact regarding whether prison officials substantially burdened his religious practices. *See Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016); *Koger*, 523 F.3d at 796. The prisoner must also raise a material question of fact as to whether the burden on his religious practice was justified, meaning it furthered a legitimate and compelling state interest and was the least restrictive means available. *Thompson*, 809 F.3d at 379; *Koger*, 523 F.3d at 796.

The Court begins its analysis by asking whether Plaintiff's religious beliefs were substantially burdened when he was denied access to multiple religious services per week. A substantial burden "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thompson*, 809 F.3d at 379 (citations omitted). *See also Koger*, 523 F.3d at 799 ("[A] regulation that imposes a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable.").

Here, Plaintiff simply argues that he could not attend *multiple* religious services, but he was still allowed to attend some or at least one. He has not provided the court with information as to *how* the denial of attending multiple religious services impacted him, or his ability, to practice his religion. While he provides some information about his desire to attend multiple religious services, namely that he only changed his designation from Protestant to Catholic at a prior institution because he could not get into the protestant

chapel lines, he has not explained what the denial of multiple chapel lines means for his religious practices. When asked directly how this denial impacted him, Plaintiff stated, "Well, that's my right. I mean, I have a right to practice whatever religious[sic], and it harms me because I'm not able to practice that religion based on being stripped of that" (Doc. 74-2, p. 12). It is certainly clear that Plaintiff preferred to attend multiple religious services per week. But ultimately, he was never precluded from attending the one religious service for the religion that he identified as his religious affiliation within IDOC's internal records – namely Catholic Mass. As such, Plaintiff has failed to show how his inability to attend multiple religious services per week placed a substantial burden on him. Defendants are entitled to summary judgment on this claim.

IV.     Count 4 –Defendant Sterrett violated Plaintiff's 14th Amendment Right to Equal Protection

"The Equal Protection Clause guards against government discrimination on the basis of race and other immutable characteristics, but it also extends to protect people from so-called 'class-of-one' discrimination in which a government arbitrarily and irrationally singles out one person for poor treatment." *Brunson v. Murray*, 843 F.3d 698, 705 (7th Cir. 2016) (citing *Geinosky v. City of Chicago*, 675 F.3d 743, 747 (7th Cir. 2012)).[8]

Here, Plaintiff claims that he was targeted by Defendant Sterrett for filing grievances and punished by being removed from Protestant chapel lines while other

---

[8] Again, it appears Defendants may have misunderstood Plaintiff's claim as a "class of one," which was designated in the threshold Order entered on May 30, 2018 (Doc. 5, p. 15). Defendants do not directly address the Equal Protection claim in their motion for summary judgment; rather, they seem to argue that Plaintiff's claim is based on his membership in a class of Catholic prisoners, which misses the mark (Doc. 74).

prisoners were allowed to participate in separate denomination services (Doc. 76, pp. 39, 50). Thus his claim is predicated on his assertion that he is part of a "class of one" claim.

For an equal-protection claim based on membership in a class, the relevant standard of review is rational basis review. *Garrett*, 531 U.S. at 367; *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 446 (1985); *Stevens*, 210 F.3d at 737–38. "Rational basis review requires the plaintiff to prove that (1) the state actor intentionally treated [him] differently from others similarly situated; (2) this difference in treatment was caused by [his] membership in the class to which [he] belongs; and (3) this different treatment was not rationally related to a legitimate state interest." *Srail v. Vill. of Lisle, Ill.*, 588 F.3d 940, 943 (7th Cir. 2009) (citing *Smith v. City of Chicago,* 457 F.3d 643, 650–51 (7th Cir. 2006)). Proceeding on a "class of one" equal protection claim means, "for practical purposes," that the plaintiff "need not demonstrate the second element of an equal protection challenge." *Srail*, 588 F.3d at 940. *See also Williamson v. Curran*, 714 F.3d 432, 449 (7th Cir. 2013) ("[A] class-of-one equal protection claim . . . at a minimum would require proof that the defendants intentionally treated [plaintiff] differently from others situated similarly to her for no rational reason.").[9]  *See also Swanson v. City of Chetek*, 719 F.3d 780, 783-84 (7th Cir. 2013).

---

[9] It remains unresolved in the Seventh Circuit whether the plaintiff in a "class of one" claim must also demonstrate that the discriminatory treatment was based on improper motive, hostile intent, or personal animus. *Chicago Studio Rental, Inc. v. Illinois Dep't of Commerce*, 940 F.3d 971, 979 (7th Cir. 2019) (citing *Del Marcelle v. Brown Cty. Corp.*, 680 F.3d 887(7th Cir. 2012). *See also Brunson v. Murray*, 843 F.3d 698, 706 (7th Cir. 2016) (explaining the doctrinal disagreement that occurred in *Del Marcelle* and remains unresolved). *See also Frederickson v. Landeros*, 943 F.3d 1054, 1062 (7th Cir. 2019)

This means Plaintiff must prove that the disparate treatment he was subjected to was not rationally related to a legitimate state interest. "This deferential standard of review is a notoriously 'heavy legal lift for the challenger[ ].'" *Monarch Beverage Co. v. Cook*, 861 F.3d 678, 681 (7th Cir. 2017) (quoting *Indiana Petroleum Marketers & Convenience Store Ass'n v. Cook*, 808 F.3d 318, 322 (7th Cir. 2015). *Accord Srail,* 588 F.3d at 946 (rational basis "is an onerous test to overcome"); *Smith*, 457 F.3d at 652 (rational basis is "a lenient standard"). If the relevant principal characteristics of the plaintiff and other individuals are the same, but others received more favorable treatment, this may indicate the absence of proper motivation for the disparate treatment. *See Geinosky v. City of Chicago*, 675 F.3d 743, 748 (7th Cir. 2012). The burden is on the plaintiff "to eliminate any reasonably conceivable state of facts that could provide a rational basis for the classification." *Srail,* 588 F.3d at 946 (quoting *Smith*, 457 F.3d at 652). *Accord Stevens*, 210 F.3d at 738 ("The burden rests on the individual to demonstrate that the government's claimed purpose is illegitimate or that the means used to achieve that purpose are irrational."). In other words, "[a]ll it takes to defeat the plaintiffs' claim is a *conceivable* rational basis for the difference in treatment." *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686–87 (7th Cir. 2013) (citing *Heller v. Doe,* 509 U.S. 312, 320 (1993); *see also Srail,* 588 F.3d at 946–47 ("[A]ny rational basis will suffice . . . .").

To avoid summary judgment on his equal protection claim, Plaintiff needed to provide evidence that prison officials purposefully treated him differently than other Catholic prisoners   (Doc. 1, p. 15). *See also Xiong v. Wagner*, 700 F.3d 282, 295 (7th Cir. 2012); *Brown v. Budz*, 398 F.3d 904, 916 (7th Cir. 2005); *DeWalt v. Carter*, 224 F.3d 607, 618

(7th Cir. 2000). Plaintiff has submitted into evidence the declarations and supporting materials from a number of other inmates, showing that some Catholic prisoners who did not participate in filing the PREA grievance were still allowed to attend multiple religious services (both Catholic and Protestant, for example) even after Defendant Sterrett began his review of chapel lines. One of the most persuasive pieces of evidence is from another inmate, Mr. Carrasco, who identifies as Catholic and was approved for additional Protestant services, including the exact services Plaintiff previously attended, by Defendant Sterrett on or around April 28, 2018, after Plaintiff was removed from Protestant services and after Defendant Sterrett allegedly began his review of chapel lines to ensure "all assignments were in compliance with the Department Rule 425" (Doc. 76, p. 50; 74-7, p. 21).

Additionally, Plaintiff points to portions of the record that indicate he was allowed to resume both Protestant and Catholic services after Defendant Sterrett left Shawnee. Plaintiff submitted his activity card dated September 8, 2018, which shows that Plaintiff was reinstated by Defendant Walker in his original three Protestant services and one Catholic service after Defendant Sterrett left Shawnee on or around September 1, 2018 (Doc. 76, p. 20, 61).

Defendant Sterrett contends that he never violated Plaintiff's rights under the Equal Protection Clause because he had a legitimate governmental interest in removing Plaintiff from these services, specifically relating to safety and resources. Additionally, since Plaintiff was always allowed to attend his Catholic services, there could not be a constitutional violation. Defendant Sterrett argues that allowing prisoners to attend

multiple services requires additional resources, but does not specify what those additional resources are (Doc. 74, p. 7). While the Court understands that the IDOC does not have unlimited funds and resources, the Court cannot determine that this is a legitimate governmental interest without additional supporting information. If Protestant services were still occurring with or without Plaintiff's attendance, it is unclear how Plaintiff's attendance would further burden the IDOC financially. Similarly, Defendant Sterrett argues that there was a security concern, as Plaintiff had been caught talking during services. But Plaintiff disputes this fact and says he was not talking. Moreover, Plaintiff says Defendant Mahan had specifically pointed Plaintiff out as a member of the LGBTQ community during service, and that he was kicked out of service because of his LGBTQ identity.

Defendant Sterrett also stated that Plaintiff was removed due to his safety and pursuant to the PREA, which requires an accusing prisoner to be separated from the person at the heart of their PREA grievance. This argument is similarly unavailing since the investigation into Plaintiff's PREA grievance resulted in little to no action from the IDOC, as Defendant Mahan was allowed to continue working at Shawnee.[10]  Plaintiff was then reinstated in Protestant services, led by Defendant Mahan, in September 2018, immediately *after* Defendant Sterrett left Shawnee. If the PREA grievance required Defendants to separate Defendant Mahan and Plaintiff for Plaintiff's safety, it is

---

[10] It is difficult to decipher exactly what happened with the PREA complaint as the IDOC Defendants did not submit any of Plaintiff's grievances, records, or even the cumulative counseling summary with their motion for summary judgment. As such, the Court has relied on Plaintiff's attachments to his response (Doc. 76).

confusing that he was then reinstated in those exact services later on without explanation.

Finally, Defendant Sterrett repeatedly argued that Plaintiff was part of an overall reevaluation of chapel lines, where he removed any prisoner who was attending extra services that did not align with their religious designation cards in order to comply with an IDOC directive. Most striking is that this directive does not *require* that all prisoners only attend religious services that align with their designation cards, as Plaintiff pointed out since he has been incarcerated over thirty years and has always attended multiple religious services at different IDOC facilities until this period when Defendant Sterrett revoked his permission. The directive indicates that prisoners may only attend religious activities for the faith group designated on their card "unless otherwise approved by the Senior Chaplain" (Doc. 74-7, p. 3). The directive gave Defendant Sterrett the ultimate decision-making power as to what religious services prisoners could attend, and the Court has already highlighted that Plaintiff submitted supporting materials from other prisoners to show that Defendant Sterrett's review and application of the directive was not applied consistently and uniformly to all Shawnee prisoners.

Plaintiff testified that Defendants' reasons for his removal from religious services were pretext, further supported by Defendant Walker's allowance of Plaintiff to return to Protestant Services after Defendant Sterrett left Shawnee (Doc. 74-2, p. 10). There is support for Plaintiff's testimony and his contention in the record, as he was not removed from two of his Protestant services until he filed the PREA grievance and then was removed from his last Protestant service after he filed a grievance against Defendant Sterrett (Doc. 76, pp. 17-18, 35).

Plaintiff has submitted evidence that raises genuine issues of material fact as to whether Defendant Sterrett intentionally treated him differently than other Catholic prisoners for no rational reason and, as such, this claim will proceed against Defendant Sterrett.

V.     Qualified Immunity

Finally, Defendants assert that summary judgment is appropriate because they are entitled to qualified immunity on all claims. The Court will examine Plaintiff's Counts I and IV against Defendant Sterrett, as the Court has determined there exists genuine issues of material fact as to these two claims only.

Qualified immunity "protects government agents from liability when their actions do not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 914 (7th Cir. 2011) (citing *Purvis v. Oest*, 614 F.3d 713, 720 (7th Cir. 2010)). The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v, Callahan*, 555 U.S. 223, 231 (2009).

The test for qualified immunity has two prongs: (1) whether the facts shown, taken in the light most favorable to the party asserting the injury, demonstrate that the official's conduct violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232. *See also Brosseau v. Haugen*, 543 U.S. 194, 197 (2004); and *Wilson v. Layne*, 526 U.S. 603, 609 (1999). "If either

inquiry is answered in the negative, the defendant official is protected by qualified immunity." *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018) (quoting *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017)).

A clearly established right is one that is "defined so clearly that every reasonable official would have understood that what he was doing violated that right." *Dibble v. Quinn*, 793 F.3d 803, 808 (7th Cir. 2015) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). There does not need to be a case directly analogous, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The right must be "particularized" such that the "contours" of it are clear to a reasonable official. *Reichle*, 566 U.S. at 644. "[T]he Seventh Circuit has long held that 'the test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted.'" *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013) (quoting *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir. 1987)).

Defendant argues that Plaintiff cannot prove either prong of the aforementioned test because 1) the facts alleged by Plaintiff do not give rise to constitutional violations, and 2) if the Court were to determine that the facts alleged did give rise to a constitutional violation, Defendants would be held to a higher standard than warranted by the Constitution, as Plaintiff's complaint is chiefly about being allowed to attend multiple religious services outside his designated religion and prison officials do not have to accommodate every religion Plaintiff wishes to practice (Doc. 74, pp. 14-16). Defendants' arguments miss the mark, though, and Defendant Sterrett is not entitled to qualified immunity.

Page 26 of 28

Plaintiff's first claim contends that Defendant Sterrett retaliated against him for filing grievances in violation of the First Amendment. Retaliation for filing grievances is a clearly established right. The Court has determined that genuine issues of material fact exist for this claim to proceed past summary judgment. When viewing the facts in the light most favorable to Plaintiff, Defendant Sterrett's conduct, as alleged and if true, would have violated a clearly established right. *See DeWalt*, 224 F.3d at 618. Qualified immunity is not appropriate because "retaliation against constitutionally protected conduct is actionable regardless of whether the defendant's actions independently violate the constitution" and Defendant Sterrett "would have been on notice that *any* retaliation, whatever its shape, could give rise to liability." *Babcock,* 102 F.3d at 276; *see also DeWalt,* 224 F.3d at 618 (concluding that a prison official may not retaliate against a prisoner for pursuing his right of access to the courts "even if the adverse action does not independently violate the Constitution.").

As for Count IV, Plaintiff's claim is related to a "class of one" Equal Protection claim, and not related to Plaintiff's desire to attend any religion he wishes to practice, as Defendants argue. Prison officials know that they cannot discriminate against a prisoner on the basis of a "class of one." For at least the last 20 years, it has been clearly established that a state actor cannot intentionally treat a plaintiff differently from others similarly situated, singling the plaintiff out arbitrarily for unfair treatment without rational basis or a rational relationship to a legitimate state interest. *See Olech,* 528 U.S. 562; *Abcarian,* 2010 WL 3189153, at *6; *Srail,* 588 F.3d at 943. In the present matter, as there are competing versions of the motivation behind Defendant Sterrett's actions for

removing Plaintiff, and not other prisoners, from additional chapel lines, it would be premature for the Court to rule on the issue of qualified immunity at this time. *See Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009) ("When the qualified immunity inquiry cannot be disentangled from disputed facts, the issue cannot be resolved without a trial." *See Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002) ("If there are genuine issues of fact concerning [an element of the claim], a defendant may not avoid trial on the grounds of qualified immunity.").

Accordingly, Defendant Sterrett is not entitled to qualified immunity.

## CONCLUSION

For the aforementioned reasons, the Court **GRANTS in part and DENIES in part** Defendants' motion for summary judgment (Doc. 73). Counts II and III of Plaintiff's Complaint are **DISMISSED with prejudice**, which results in the dismissal of Defendants Dennison, Pickford, Walker, and Mahan. Counts I and IV will proceed against Defendant Sterrett.

**IT IS SO ORDERED.**

**DATED: March 31, 2021**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**